**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **L. Michael Newman,** | : | |
| | : | |
| Plaintiff, | : | Case No. |
| | : | |
| v. | : | Judge |
| | : | |
| **Luke Perez, Assistant Professor,** | : | Magistrate Judge |
| Ohio State University Salmon P. Chase | : | |
| Center for Civics, Culture, and Society, | : | |
| in his individual capacity, | : | |
| | : | : |
| and | : | |
| | : | |
| **Christopher Green**, | : | |
| Ohio State University Professor of Law, | : | |
| In his individual capacity, | : | |
| | : | |
| Defendants. | : | |

**COMPLAINT**
**(Jury Demand Endorsed Hereon)**

## I.     INTRODUCTION

1.     This is an action for compensatory and punitive damages, as well as injunctive relief, pursuant to 42 U.S.C. § 1983, arising from a series of acts of wrongful physical seizure and retaliation for exercising the rights of freedom of speech and freedom of the press by Defendant Luke Perez, a faculty member of the Ohio State University ("OSU" or "the University") associated with its state-mandated "civic thought center," the Salmon P. Chase Center for Civics, Culture, and Society, and Christopher Green, a professor and the associate director of that center, in violation of the First and Fourth Amendments to the U.S. Constitution.

1

2. On February 9, 2026, Plaintiff Michael Newman, a documentary filmmaker and citizen journalist, along with another central Ohio journalist, attempted to conduct a video-recorded interview of OSU President Emeritus E. Gordon Gee, who was a guest lecturer at a class co-taught by Defendants Perez and Green for OSU, regarding high-profile controversies involving OSU. Defendants Perez and Green attempted to limit the two journalists' access to and questioning of President Gee.

3. After a few minutes of questioning, Defendant Green announced that the interview was over, ushered Gee into a classroom, and stood between the journalists and the classroom door. When Mr. Newman attempted to continue filming and questioning Gee, Defendant Perez stepped into Newman's path, knocked him and his camera equipment to the ground, and struck him in the face while he was attempting to get up from the ground. Defendant Green subsequently alerted law enforcement, falsely blamed Newman for provoking Perez's physical attack, and had Newman banned from a public OSU building.

4. Defendant Perez's actions violated Mr. Newman's right to be free of unreasonable seizures. His actions and those of Defendant Green, as state officials, and as agents of an institute expressly dedicated to advancing the agenda of Ohio's political leaders, were conducted under color of state law and undertaken in retaliation for the free speech and press activities of Mr. Newman and his fellow journalist.

## II.  <u>JURISDICTION AND VENUE</u>

5. This court has federal question jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331, this being an action pursuant to 42 U.S.C. §§ 1983 and the United States Constitution.

6. At all relevant times, the parties resided and conducted business, and the events herein took place, in Franklin County, within the Southern District of Ohio, Eastern Division.

### III.   PARTIES

7. Defendant Luke Perez is an Associate Professor and employee of OSU, a public university and a political subdivision of the State of Ohio.  OSU is an employer with over 40,000 employees. Among many other entities within OSU, the University includes the Salmon P. Chase Center for Civics, Culture, and Society ("the Center"). OSU's main campus, the offices of the Chase Center, and Professor Perez's office are all located in Columbus, Ohio, within the jurisdiction of the Southern District of Ohio, Eastern Division. Professor Perez is sued in his personal capacity.

8. Defendant Christopher Green is the former Associate Director of the Center and a tenured full Professor of the University. His office is located in Columbus, Ohio, within the jurisdiction of the Southern District of Ohio, Eastern Division. He is sued in his personal capacity.

9. Plaintiff L. Michael Newman is a male resident of Fairfield County, Ohio, within the jurisdiction of the Southern District of Ohio, Eastern Division. He has been a filmmaker for over two decades, and maintains a YouTube site containing some of his past and ongoing work at https://www.youtube.com/geistmeister .

10. The actions of the Defendants and their agents and employees were within the scope of their employment and undertaken with malice and knowing disregard for the Plaintiff's rights under clearly established federal law. At all relevant times, the Defendants and their agents and employees acted in concert with each other to retaliate against Mr. Newman and interfere with his First Amendment activities.

IV.     <u>FACTS</u>

      A.     **The Chase Center and the Defendants' Roles**

11.     In 2023, the state of Ohio enacted legislation mandating the creation of five "schools of civic thought" at state universities, one of which became the Salmon P. Chase Center at OSU ("the Center").

12.     The creation of these schools was part of a package of controversial academic policies in Ohio Senate Bill 1, a set of measures that purport to promote free speech and "intellectual diversity" on college campuses.

13.     The stated mission of Senate Bill 1 and the creation of the civic thought centers was to encourage academic freedom and freedom of speech.

14.     In addition to instituting the Center as mandated by law, OSU structured it to advance its own interests, including improving the public image of the University and strengthening its relationships with the state's political leadership and business community.

15.     This goal of image maintenance was of particular importance to OSU between 2023 and the present because of high-profile challenges the University faced, including a public scandal and series of lawsuits involving the concealment of sexual abuse of student-athletes by Dr. Richard Strauss; and the involvement of Leslie Wexner, a long-time OSU trustee, major donor, and namesake of multiple OSU institutions, with disgraced financier and sex trafficker Jeffrey Epstein.

16.     As part of this mission, in the academic term beginning in January 2026, the Center offered a seminar entitled "Profiles in American Leadership," co-taught by Defendants

4

Perez and Green. The course centered on visits by various current and former political and religious leaders associated with OSU and central Ohio.

17. This course was a prime example of the purpose of the Chase Center for OSU. The visiting leaders were able to secure status as honored guest lecturers at a major public university, while the university would benefit from gaining favor with well-connected political, religious, and business leaders and offering students an opportunity to network with those leaders.

18. Defendants Perez and Green understood this mutually beneficial arrangement, and they understood that a key part of their role as the teachers of this course was to arrange a welcoming environment and VIP treatment for the influential leaders who were participating in it.

19. OSU faculty members who invite guests to their classrooms are always understood to be responsible for arranging a comfortable environment for these guests of the university. This often includes escorting them to and from the Columbus airport, local restaurants, and their arranged lodging. The duties of Defendants Perez and Green with respect to the invited guests of their Profiles in American Leadership class were simply one iteration of those ordinary and expected duties, with the importance elevated based on the status of the guests and their importance to OSU's mission.

20. OSU's University Faculty Rules, which are part of the Ohio Administrative Code and are incorporated by reference in every faculty member's employment contract, including the Defendants', also anticipate, at Rule 3335-5-06, that inviting guest speakers to campus may provoke controversy. The same rule expressly requires that

5

faculty members who invite guest speakers are responsible for ensuring that their appearances are conducted "in an orderly manner."

21. One of the VIP guest lecturers for the Spring 2026 class was OSU President Emeritus E. Gordon Gee. President Gee is a prominent figure strongly associated with OSU's public image, having led the university for two separate periods, and known during both those periods for establishing and enhancing connections between the university and wealthy donors, including Mr. Wexner, who was instrumental in Gee's hiring.

**B.      President Gee's Visit and the Plaintiff's Attempt to Record an Interview**

22. President Gee was scheduled to visit the Defendants' class on the afternoon of February 9, 2026.

23. Mr. Newman learned in advance of President Gee's visit from a news report.

24. Mr. Newman is a documentarian and citizen journalist. His journalistic efforts are largely devoted to the creation of documentary video projects on a variety of subjects, including major cultural and civic institutions in central Ohio.

25. As of February 2026, Mr. Newman had been working for years on a long-form documentary film project about OSU and its handling of a variety of public controversies, including during Dr. Gee's second OSU presidency.

26. As part of this project, Mr. Newman had previously spoken or attempted to speak with and video-record conversations about high-profile issues with OSU officials at public events, including a number of current and former OSU officials.

27. Mr. Newman had previously interviewed Dr. Gee, with his permission, following a different Chase Center lecture in 2025, in Defendant Green's presence. Mr. Newman's

interview of Dr. Gee at that time included questions about his role in OSU's response to the Strauss and Epstein scandals referenced above.

28. Mr. Newman was interested in having another opportunity to speak with and record President Gee for his documentary.

29. Mr. Newman also knew that another local journalist, DJ Byrnes, who operates an online publication called The Rooster, would be interested in an opportunity to interview President Gee. Mr. Byrnes often reported on controversies affecting OSU, including the ties between Leslie Wexner and Jeffrey Epstein, which were being heavily reported on in the media at the time due to the release of the federal government's files on Epstein and an impending deposition of Mr. Wexner in congressional proceedings.

30. Mr. Newman alerted Mr. Byrnes to Gee's visit and suggested the idea of filming an interview of Gee for the Rooster that might also be included in Mr. Newman's documentary. Mr. Byrnes agreed to Mr. Newman's suggestion.

31. On the afternoon of February 9, 2026, Mr. Newman and Mr. Byrnes went to Smith Laboratory, which was the building at OSU where the Defendants' class was held.

32. Smith Laboratory, like most buildings at OSU, is a publicly owned building that is open to the public during daytime hours. No keycard access or other check-in is required for anyone to walk into it when the doors are unlocked.

33. When the two journalists arrived at the Defendants' classroom, President Gee was in the midst of his lecture. Mr. Newman and Mr. Byrnes went to a nearby break room to wait for the class to end.

34. As the class ended, Mr. Newman and Mr. Byrnes positioned themselves in the hallway outside the door of the classroom.

35. After the class ended and the students had left, President Gee walked out of the classroom, along with Defendant Green. Mr. Newman, who had a small video camera in one hand and a cellphone mounted on a monopod in the other, began filming the encounter.

36. When President Gee walked by Mr. Byrnes, Mr. Byrnes introduced himself as a representative of the Rooster. Gee greeted him, but then entered the restroom across the hall. Mr. Byrnes and Mr. Newman continued waiting, and Defendant Green returned to the classroom.

37. Once Defendant Green returned to the classroom, Mr. Newman and Mr. Byrnes could see him conferring with Defendant Perez.

38. After a short time, Defendant Green and Defendant Perez both left the classroom and entered the hallway.

39. When Mr. Newman turned his camera toward Defendant Perez, Perez abruptly stated that he did not know who he was or why he was there, and he did not consent to being filmed. Mr. Newman replied that he did not know who he was either and would not put him on camera.

40. Just before President Gee exited the restroom, Defendant Green approached Mr. Byrnes and informed him that he could talk to Gee briefly as long as he did not try to chase him out of the building and follow him to his car. Mr. Byrnes agreed. Mr. Newman was not involved in this conversation, except to film it.

41. President Gee then exited the restroom and began speaking with Mr. Byrnes and answering his questions. Mr. Newman video-recorded the interview, and Defendants Green and Perez stood nearby watching the interview.

42. Mr. Byrnes asked Gee a series of uncomfortable questions about his role as OSU's president in providing support to Mr. Wexner despite his ties to Jeffrey Epstein, his role in the longstanding controversy over the sexual abuse of OSU wrestlers by Dr. Strauss, and his decision to sell OSU's parking spaces to a private firm.

43. After speaking to Mr. Byrnes for approximately six minutes, President Gee began moving away from Mr. Byrnes, and Defendant Green stepped in between Mr. Byrnes and President Gee, announcing that the time he had agreed to let Byrnes speak to Gee had ended.

44. President Gee then walked into the Defendants' classroom.

### C.   Defendant Perez's Attack on the Plaintiff

45. As President Gee walked into the classroom, Mr. Newman realized that Mr. Byrnes had not covered a topic he had been interested in hearing from Gee about—the issue of student loan debt. He therefore stated to Defendants Green and Perez that he would like to ask Dr. Gee more questions, and pointed out although Mr. Byrnes may have, he had not agreed to any particular time limit.

46. With the classroom on his righthand side, Mr. Newman walked around Defendant Green to the left, and positioned himself so that his camera was pointed toward the open door of the classroom and President Gee.

47. As Mr. Newman did this, Defendants Perez and Green stood between the two journalists and the open doorway of the classroom. As Mr. Newman was facing the classroom, Defendant Perez was on the left-hand side of the doorway, closest to him, and Defendant Green was on the right-hand side, closer to Mr. Byrnes.

9

48. Mr. Newman told the Defendants he needed to ask President Gee a few more questions, and both Defendant Green and Defendant Perez told him they would not permit it. Defendant Green said, "you do not *need* to ask him more questions," while Defendant Perez said that Green had already told Byrnes he was on his last question.

49. As Defendant Perez said this, Mr. Newman took a step toward the classroom door, moving to his right and around Defendant Perez. He stated to Perez and Green, "just one more [question]."

50. Defendant Perez loudly said "no" and moved to his left, directly into Mr. Newman's path.

51. Mr. Newman responded by quickly taking a step backward, away from the classroom door and Defendant Perez, who was taller and much heavier than Mr. Newman.

52. After Mr. Newman stepped back, Defendant Perez lunged toward him, slapping the cellphone out of Mr. Newman's left hand and onto the floor, where the monopod holding the phone broke into pieces.

53. Defendant Perez then grabbed Mr. Newman around both shoulders. He jerked Mr. Newman's head forward and struck him in the face with his open hand as he shoved him forcefully into the door frame behind him and onto the ground. He then stood over Mr. Newman, yelling that he had told Mr. Newman not to put a camera in his face, and shoved him down again with his hand as Mr. Newman tried to get back on his feet.

**D.      Further Retaliation Following the Attack**

54. Following Defendant Perez's physical attack on Mr. Newman, Perez left the scene.

55. Defendant Green remained with President Gee as Mr. Byrnes attempted to ask them questions about Perez's conduct. After Mr. Byrnes and Mr. Newman continued to seek

to obtain and record their comments, Defendant Green escorted President Gee out of the building and to his vehicle.

56. Once Gee had left, Mr. Newman and Mr. Byrnes left the premises and sought assistance from OSU's police department.

57. Meanwhile, Defendant Green contacted his supervisor, Professor Lee Strang, the director of the Chase Center.

58. Upon information and belief, Defendant Green falsely informed Director Strang that the physical attack by Defendant Perez was provoked by Mr. Newman initiating contact with him, and that Mr. Newman and Mr. Byrnes were the physical aggressors in the incident.

59. Director Strang contacted the OSU Public Safety Office to request that an OSU police officer come to Smith Laboratory to take a report. Defendant Green was present during this call, and confirmed in response to the dispatcher's questions to Director Strang that Mr. Newman and Mr. Byrnes physically touched OSU personnel as they were aggressively confronting President Gee.

60. Defendant Green was subsequently interviewed by OSU police officers.

61. In his interview, Defendant Green again falsely claimed that Mr. Newman initiated physical contact with Defendant Perez, provoking Perez's physical response.

62. Defendant Green, who was aware of some of Mr. Newman's prior efforts to speak with OSU officials, including President Gee, for his film project, also insinuated to the police officers that Mr. Newman was stalking President Gee, that he was mentally ill or "unwell," and that OSU's media team had compiled an "entire list" about him.

11

63. Defendant Green also falsely claimed that during the encounter with President Gee and Defendant Perez, Mr. Newman was "putting his hand on his belt in a way that suggested that he might have a weapon."

64. Defendant Green's false statements to Strang and the dispatcher resulted in the OSU Police opening a criminal assault investigation, in which they considered Mr. Newman a perpetrator, rather than the victim, of a violent attack.

65. Based on Defendant Green's statement, Director Strang's call, and the efforts of Mr. Newman and Mr. Byrnes to contact the OSU Police, the officers who interviewed Defendant Green also interviewed Mr. Newman and Mr. Byrnes.

66. Once the OSU officers reviewed a video taken by Mr. Byrnes of the attack by Defendant Perez, they decided not to pursue charges against Mr. Newman, and instead began investigating a potential criminal charge against Defendant Perez.

67. However, based on Defendant Green's false statements to Director Strang and OSU's public safety employees, the officers who interviewed Mr. Newman issued a trespass notice banning Mr. Newman from Smith Laboratory, the public building in which he was attacked, and warning him that he would be subject to arrest if he returned.

68. The trespass warning issued to Mr. Newman was ultimately lifted, but not until several days later, after media inquiries to OSU and widespread social media discussion of the video of Defendant Perez's attack.

69. Defendant Perez was placed on administrative leave approximately two days after his attack on Mr. Newman, but upon information and belief, he remains employed by OSU and in paid status as of this filing.

70. Approximately a week after the incident, Defendant Perez was criminally charged with misdemeanor assault in the Franklin County Municipal Court in connection with his attack on Mr. Newman.

71. Defendant Perez's seizure of Mr. Newman and his property through his physical attack, as well as Defendant Green's subsequent efforts to use false statements to provoke a criminal prosecution of Mr. Newman and ban him from a public building, were motivated by the Defendants' hostility toward Mr. Newman's efforts to record a journalistic video of an interview of President Gee and to interview Gee himself.

72. Both Mr. Byrnes's interview and Mr. Newman's video recording efforts were interpreted by Defendant Perez and Defendant Green as intended to embarrass their employer, OSU, and their invited guest, President Gee, and harm their public images.

73. The Defendants' actions were undertaken under color of state law during the course of their state employment.

74. While illegal and excessive, the Defendants' actions arose within the scope of their employment by OSU.

75. Defendant Perez's unprovoked physical attack was a violation of OSU rules, Ohio law, and the U.S. Constitution, but it also constituted a misguided effort to protect the image of the university and the guest of his class and to carry out his duty to ensure that the visit of a guest speaker to his class was conducted "in an orderly manner."

76. OSU faculty are not expressly prohibited by the University on a blanket basis from using physical force, and are, instead, expressly authorized to do so in some situations.

77. Defendant Green's efforts to provoke the criminal prosecution of Mr. Newman and to ban him from a public building were similarly misguided and excessive actions that

were nevertheless within the scope of his employment. Defendant Green intended these efforts to prevent Mr. Newman, who he knew was engaged in a journalism project that could reflect poorly on OSU, from bothering and embarrassing his guest and other OSU VIPs through his activity. He believed preventing citizen journalists from causing inconvenience or annoyance to high-profile OSU affiliates would serve the interests of OSU and protect its public image and relationships with important community members. Furthering these interests was very much within the scope of his duties as associate director of the Chase Center.

78.     The Defendants' actions, while not outside the scope of their employment, were conducted with reckless disregard for the Plaintiff's clearly established constitutional and legal rights to be free of unreasonable seizures and retaliation and punishment for engaging in First Amendment-protected activity.

79.     The Defendants' actions caused the Plaintiff physical injury, emotional distress, humiliation, anger, frustration, and reputational harm.

## V.     FEDERAL CLAIMS FOR RELIEF

### A.     UNLAWFUL SEIZURE IN VIOLATION OF THE U.S. CONSTITUTION

80.     The preceding paragraphs are hereby incorporated and re-alleged.

81.     The unlawful physical attack on the Plaintiff by Defendant Perez constituted an unreasonable seizure in violation of the Fourth Amendment to the U.S. Constitution, which is actionable pursuant to 42 U.S.C. § 1983.

### B.     RETALIATION IN VIOLATION OF THE U.S. CONSTITUTION

82.     The preceding paragraphs are hereby incorporated and re-alleged.

14

83.     The actions of the Defendants in attacking the Plaintiff, interfering with his speech and journalistic activity on matters of public concern, and seeking to punish him in retaliation for that activity, constituted violations of the First Amendment to the U.S. Constitution, which are actionable pursuant to 42 U.S.C. § 1983.

## VI.     <u>PRAYER FOR RELIEF</u>

84.     WHEREFORE, Plaintiff asks for judgment against Defendants and requests:

A.     Compensatory and punitive damages in an amount to be determined by the jury;

B.     Declaratory and injunctive relief protecting the Plaintiff from further interference with his First and Fourth Amendment rights;

C.     The costs of this action, including, but not limited to, reasonable attorneys' fees;

D.     Pre- and post-judgment interest and compensation for the tax consequences of the delayed payment of the Plaintiff's compensation; and,

E.     Any other relief deemed appropriate by the Court.

Respectfully Submitted,

/s/Jeffrey P. Vardaro
Jeffrey P. Vardaro (0081819)
Email: jvardaro@gitteslaw.com
**The Gittes Law Group**
723 Oak Street
Columbus, Ohio 43205
Phone: (614) 222-4735
Fax: (614) 221-9655

/s/Edward R. Forman
Edward R. Forman (0076651)
Email: eforman@marshallforman.com
MARSHALL FORMAN & SCHLEIN LLC
250 Civic Center Dr., Suite 480
Columbus, Ohio 43215-5296
Phone: (614) 463-9790
Fax (614) 463-9780
Attorneys for Plaintiff Michael Newman

15

## JURY DEMAND

The Plaintiffs hereby demand a jury of eight (8) to determine all issues triable by jury in this matter.

/s/Edward R. Forman
Edward R. Forman (0076651)